The next case up is United States v. Quintana. It is docket 22-2069. Counsel, we're ready to hear from you when you're ready to present. Good morning. May it please the court. My name is Eric Hannum. I'm here on behalf of Rhonda Quintana, the appellant. The appellant in this case, Ms. Quintana, is currently serving a sentence in federal prison in Arizona. This case is really pretty simple. It's about authentication as a prerequisite for admissibility in a trial context. It's also about harmless error and to what extent can an error reasonably be called harmless. And it is particularly and specifically about a serial number on a single $100 bill. Now, a substantial part of the government's case against Rhonda Quintana was a match between the serial number on a photograph of a $100 bill that was recovered from her telephone and a list that was admitted into evidence as a government's exhibit that lists of the serial numbers of the bills stolen from a credit union in Albuquerque on March 9th, 2018. Now, just to be clear, Ms. Quintana was not charged or convicted in that March 9th robbery, but a large part of the government's case involved the facts surrounding that robbery as proof that she knew that Mr. Verdream, the person who went into the banks and conducted the robberies, that he was going to rob her on March 13th of that year. So, without this purported list that was admitted without a proper evidentiary foundation, specifically without proper authentication... Counsel, are you challenging... This is exhibit 9A, right? It's the list. The list, yes. Are you challenging its authenticity or its accuracy? Authenticity. Okay. What about it... And it's the lack of a foundation to establish authenticity? I'm struggling with... I'm reading your argument, and tell me where I'm wrong. I'm reading your argument about authenticity as really an argument that suggests that there was another list and then banks said, that's not the right list. Here's the right list. And that that kind of created a suggestion that maybe we didn't actually have the right document in front of us. That seems to me to be a challenge to the accuracy, not the authenticity. So, tell me how I have this wrong if I do. I think we only reach accuracy after we've addressed authenticity. To establish authenticity, the government in this case relied on two of the several factors in Rule 901. And, of course, these are examples. They're not exclusive. The first one was testimony of a witness with the FBI agent who testified, and through whom that list was admitted, had sufficient personal knowledge about its origins to verify that it was authentically a list of serial numbers stolen from Nusenda on March 9th. Secondly, the government argued that specific characteristics of this list, of the document itself, showed authenticity. I think these two concepts are kind of bound together here. If the ... Let me back up a little bit. The agent testified that he didn't know how this list was compiled. He didn't know how it came to be. As the court has noted, he didn't know what was wrong with the first list, that it needed to be replaced with a second list. He knew essentially nothing about how this list came into being, nothing about the source of this list. Now, if we move on to the second of the methods that the government proffered, specific characteristics, the document itself is essentially an email, a printed email, from someone whose title is security specialist at Nusenda Credit Union. I think it would be useful as a kind of thought experiment to eliminate the FBI agent completely. Let's just say he doesn't know anything about this list and it's being admitted because of its distinctive characteristics. If the government had offered this list through the security specialist at Nusenda, if that person himself came to testify and still provided no evidence about how this was compiled, who stored it, who made it, it would still be inadmissible. Let me ask this then. Let me cut in the back way and just ask you, what did the teller, Ms. Loya Medina, need to testify to that you would be satisfied with the authenticity? Well, certainly she would have had to say something more than what she said, which is, it's probably a list of the bills that I probably gave him. That contains no actual information. If Ms. Loya Medina had said, I've worked at this bank for five years, this machine that I've used before counts out the bills, and this machine records serial numbers, and I retrieved from this machine these serial numbers, and these are the serial numbers that I then gave to the FBI agent or to the Nusenda security specialist, that would be all she said was, this is probably a list of the money I probably gave him. That is clearly pure speculation and not a sufficient foundation. Even though it could have been done better, certainly, is it an abusive discretion for the court to admit 9A? I would say yes, and I think the court's exercise of its own sound discretion was derailed by an assurance from the government that this list would be properly authenticated. Do you think that it was conditionally admitted then at that point? The court said it was admitted. It didn't say conditionally or not conditionally, but even if we assume that it was conditional, when it was later challenged, it was not ever withdrawn. It was admitted without a proper foundation, either by a person with knowledge or by specific characteristics. The next question then is whether or not this is harmless error. Before you go there, Exhibit 9A only has list two, correct? The second list, the one that's purported to be the correct list. The purportedly accurate list. Right. In fact, It is, when you're in trial, it's a two-step process. The mere fact that it may be authentic and authenticity is challenged doesn't mean it's admissible. There are further foundational facts that need to be established, correct? That would be correct. Also, were those objections made at some time? It may be what it purports to be, but there are other foundational materials that need to be established. Was that objection made? I was trial counsel. The objection was generally, there's not been a proper foundational aid. One of the arguments concerned authenticity. All right. So it was kind of a jumbled one. It was an objection to the admissibility both because it was inauthentic or authenticity had not been established and that other foundational aspects were not necessary, were not provided. I don't believe that we addressed other foundational aspects beyond authenticity. Let me ask you, is list one inauthentic? Is the authenticity of list one not established because it is not what it purports to be and that is an accurate reflection of bills that were taken? List one was never admitted. I understand that. I'm trying to distinguish one from two and inauthentic from authentic. If list one contains mistakes, bills that were not stolen, for example, it's not authentic because it purports to be an accurate list of the bills stolen and because there's inaccuracies, it is not what it purports to be. Is that a fair analysis? I would think that would be a fair analysis. And so correspondingly, if list two is a list and it's accurate as the bills that were taken, it is what it purports to be, correct? I think that it's kind of results in a kind of circular reasoning. It's kind of like in a search and seizure context, if there's a challenge to probable cause, for example, it would be like saying, well, we found the drugs in the trunk of the car, so that means that there was probable cause. In this case, the fact that the serial number on the pictured bill appears on the proffered list, that's kind of putting the cart before the horse. That's analogous to saying, well, we found something, so therefore there was probable cause. The number is on this list, therefore this list is authentic. So I think authenticity needs to be established before any question about accuracy can be addressed. Well, that's why I asked you about what would have satisfied you on authenticity. And what I thought you might say is, had the witness come in and testified about how she generated this list, how she knows that those dollar bills are accurately stated, or the currency, and that sort of a thing. And there wasn't that testimony, right? It was not that kind of testimony. In other words, if she comes in and she says, yes, Exhibit 9A is something generated from our bank, if that's what you're after, it's what it purports to be, a bank document, that would be authentic. It would be authenticized, but it would be irrelevant, right? Is it the relevancy tie that's missing from her testimony? Well, we have the bank teller's testimony, and there's also the government relied on the exhibit itself, which came in the form of an email from someone who had the title of security specialist. So if either of those people had come in with actual knowledge about how this thing was compiled, how it was stored, who made it, either of those would have satisfied the requirement of authenticity. And authenticity is a prerequisite for relevance. Something can't be relevant if it's not authentic. And the agent's testimony wasn't enough, why? He said he didn't know where this thing came from. He got it in an email from the bank. He got it in an email from the bank, but that's all he knew about it. He didn't know how it was compiled, how it was stored. Why is more required? I mean, the standard is, I appreciate your arguments could go to the weight of this exhibit, but why is more required under our law for establishing authenticity under the rule? I would say that the agent, we need something other than just a bare assertion. And that's really all the agent gave us. I got this from Nisenda. And if, as in the example I was making earlier, if we take the agent out of the chain of events here, just focus on the message from Nisenda, that by itself is not enough. So by inserting the agent into this chain, that doesn't cure the problem of lack of proof of authenticity. But it seems to me that the combination of the agents and the teller is sufficient. The teller says that bill, the teller, in hearing her testimony or express, is that when she was robbed, she gave him a bunch of bills. You can't expect her to know every serial number on the bill. And that's why she says that bill is probably one of them that I gave him. And so all she needs to do is testify that she gave him a bunch of bills. Then you have this email from security, and one of those bills shows up. Well, that's enough for authenticity, isn't it? Another analogy, I would say no. Another analogy might be the identification of a defendant in a criminal case. Do you see the defendant anywhere in the courtroom? And the witness says, well, it's probably that guy sitting over there at defense counsel. It's probably him. That's about what we got from the teller in this case. Well, except in that case, I would expect the speaker to know more about the perpetrator, the defendant, their victim, than a teller should know about a stack of bills that she gives to somebody who's threatening her. May I answer the question? I'm not saying that the teller needed to memorize the numbers, but it would have been a proper foundation if she could have told us something about this process and how it works, and she really didn't. Thank you. Thank you. We have just two arguments, and counsel didn't get a chance to respond on harmless. So let's give Ms. Roybal 18 minutes, and then we'll do three minutes rebuttal time. Good morning, and may it please the Court. Jamie Roybal on behalf of the United States. As the Court is aware, this appeal concerns just a single evidentiary issue from a bank robbery trial during which the United States presented the jury with really overwhelming evidence of Ms. Quintana's guilt, and among that evidence was what we're talking about here today, a list of the marked bills that the Nusenda Credit Union gave to the FBI agent after the first robbery that we charged in this case, which was March the 9th. It is the United States' position that the district court properly admitted the list of the marked bills, and it didn't abuse its discretion in doing so. When did it admit the list, or I guess put differently, when did it find that it was authentic? Was it before the teller testified, or was it conditioned, the ruling conditioned on the teller testifying? Your Honor, the ruling was not conditioned upon the teller testifying, and the district court admitted the list during Agent Fonzie's testimony, which was at the very beginning of the trial. We did inform the district court that the victim and the teller would be testifying later on in the trial, but the district court admitted it during Agent Fonzie's testimony. But didn't the district court ask? No, no, you go ahead. Didn't the district court ask, is there going to be further testimony on this, so it was important to the district court to know that? The district court asked if somebody from the credit union would be testifying who was familiar with the list. The discussion at the bench was very brief, and it was not will somebody testify as to how this machine generated these serial numbers type of thing. The question was will somebody from the credit union who is familiar with the list be testifying, and the answer was yes, and the victim teller did testify as well. This court has noted that the bar for authentication of an exhibit under Rule 901 is not especially high, and the standard is not whether the government could have laid the foundation in a more thorough manner, which I think is really the question that we're dealing with here. Could we go back just before you move on to Judge Phillips' question, sort of my question as well. In your answer brief, you say the exhibit was authenticated by witnesses with knowledge, and you say witnesses plural. So is your position dependent on the teller in addition? In other words, you need more than just the agent in order to have us affirm. The district court did not believe that, you know, because the ruling was not conditional at the time that it was admitted through Agent Fonzie. And so from my perspective, looking back on the case, the district court, I think, relied primarily on Agent Fonzie's testimony to admit the exhibit. I do think that the victim teller contributed to the authentication of it, but I don't think that it was conditioned upon, you know, her testimony. I think that it was primarily reliant on Agent Fonzie. And one thing that the victim teller did add, you know, she did say that it was probably the list of bills that I probably gave him, and obviously that could have been better. But what she also said is that there is a machine that each bank teller has at their station called a CDM machine, and that that machine keeps track of the serial numbers on the bills that it dispenses. And so she could not testify as to kind of the technology underlying that machine and how it decided which serial bills to keep track of. But her testimony does say that she dispensed bills from a machine called a CDM, which keeps track of the serial numbers that it dispenses. And as for Agent Fonzie— So the only reason why she says this is probably a bill that was included rather than this is unquestionably a bill is because she didn't know. Well, Your Honor, what we showed her was Exhibit 9A, which I believe we supplemented the record and the court has before it. And so it's not just a list of serial numbers. It's an email thread from Nusender Credit Union to the case agent. And in that email thread, it contains those lists of serial numbers. And so I think Your Honor is correct. I don't think she should have been expected to have memorized every serial number. And she herself did not—that email did not come from the victim. And so if the court looks at the exhibit, it will see that the email came from the security specialist at Nusender Credit Union. I'd like to note on that point that, again, this exhibit was not just a list of serial numbers. So as it was before the district court, the district court judge had an opportunity to see the exhibit in its entirety. And it could see that it came from a person at Nusender Credit Union on a specific date, on a specific time, and that that person had the title of security specialist. And so he said, you know, Agent Fonzie, here is the list of the serial numbers. And so as for Agent Fonzie's testimony, of course he could not testify as to how the bank kept the list of marked bills and how that machine, its technology worked. But what he could say is, I went to Nusender Credit Union on March the 9th after the robbery. I asked for a list of the marked bills, and this is the list that they gave me. What do you say to your opposing counsel's position, if I understood it correctly, that the teller's testimony, or really the government as the proponent of the evidence, hasn't established a basis for authentication unless it could show how the list was compiled? So why is that wrong? I would say that that, you know, 901B1, which is testimony of a witness with knowledge, says that we have to show that the testimony, we have to show testimony that the item is what it is claimed to be. And so here we had Agent Fonzie saying, I asked for a list, they gave me a list, and here is the email that I received. And so I think that that is sufficient. Okay, is this list, it's just a list? It doesn't have a prefatory paragraph that says, this is the list of the bills, or this is the list you requested? Does it have any textual statement like that, or is it just a list? In the email itself, it has some additional contextual information, and I believe that that is also information that the district court used to rely on in admitting the exhibit at the time of the trial that he did. So is that information to say generally, this is what you asked for? Or does it say expressly, this is a list of the bills that the machine registered or spit out? Your Honor, I'd have to take a look at the exhibit again. My recollection of it is that it's an email to Agent Fonzie that says, this is the list of the bills that was taken on the March 9th robbery. I'm sorry, yes? No, that's the answer I was looking for. Okay. As to the List 1 with mistakes, did this problem that List 1 had mistakes in it, did that arise outside the courtroom, or was it resolved in the courtroom when you're dealing with List 2? We did not admit List 1, but Agent Fonzie was questioned on it quite forcefully by Mr. Hannum. So I do think that Ms. Quintana's objection at trial and I think here today is really about the weight that the jury should have given the list as opposed to its admissibility. We've been grappling with the issue of whether mistakes in the list is a question of authenticity or it's a question of foundation for otherwise admissibility. Is List 1 authentic? Well, Your Honor, I think... Now remember, List 1, I assume, has the same prefatory statement. This is the list of bills that you asked for. And it includes, I guess, bills that the teller did not give this person. And therefore, isn't it not what it purports to be? Well, Your Honor, I think if we're still thinking, had List 1 been admitted through Agent Fonzie and had he been questioned about it, I do think it would have been authentic because it's an item that he received from the bank. And so I think that that was really a question for the jury to resolve as to how much weight to give List 2. But the question for Agent Fonzie in terms of, you know, do you recognize this? What is it? How do you know that this is what it is? And when he can say, this is a fair and accurate representation of this email that I received from New Center Credit Union, I do think under that framework, that list is authentic. It can be wrong, and it can be criticized, and it can be given little weight, but it does not mean that it is not an item that came from the bank. So it was a mistake discovered by somebody, this person who issued the list? So my understanding is that a first list was provided, and at some point later that evening, the security specialist from the bank, through talking with other colleagues at the bank, realized that the first list was incorrect. And this kind of pivots into the—well, I have two points to make off of that. The first point I have is that we admitted a second list of marked bills from the Rio Grande Credit Union from the second robbery on March the 13th, and we admitted it in an identical fashion. From Agent Fonzie, is this what you received from the Rio Grande Credit Union? Yes, it is. Is it a fair and accurate representation? Yes, it is. And it was admitted without any objection from the defense. And in addition to those documents, the other documents that we admitted were the list showing exactly the loss amount, and those were admitted without objection. And so I don't think the question here is a foundational question. I do think the question is, how much weight should the jury have given this list? And I think this assists the court in the second part of its analysis, which is whether or not this was error that warrants a new trial. And certainly the answer to that is no. And the reason for that is that this had such little evidentiary value at trial, and I really strongly disagree with the notion that it was a central part of our evidence at trial because it simply was not. So I think it was quite unlucky that Ms. Quintana sent a photo of this bill and that it happens to be a marked bill from the robbery, but that doesn't really go to show her knowledge of bank robberies, the serial numbers matching. No, but in fairness, you can say that when you're talking to us on appeal. But when you're in trial and you get this picture of a bill and she's saying, whoopee, look at this, you know, that's pretty good jury stuff. It's not so good up here. But that to me suggests it was very important. Your Honor, it was important. The photo from the text message from her cell phone was important, and it had that kind of hooray effect that Your Honor is describing because Ms. Quintana told the FBI that she never saw the bank robber with any money, that he never gave her any money, that she drove for this ride share service called $5G Rides, and that it was cash only and they paid $5 per ride. And so what she said is that she never saw him with any money, that he never gave her any money past, you know, beyond the $5 for the ride. And then within 40 minutes of the March 9th robbery, she's sending a photo of this very crisp $100 bill. That was the hooray moment at trial for the United States. And I think for the jury, it was not the fact that the serial numbers matched. It was two hoorahs. It was one, the bill on her phone, and it matches. And then the second hoorah was, and then you lied. So it was two hoorah moments, all generated by this issue that we're addressing in this case. My point is, that's pretty strong stuff. And you have to consider the strength of that when you look at the harmlessness issue. Well, I think if the court, when the court goes back to conduct its de novo review of the record, you will see that this was the serial number issue was far from emphasized at trial or made a centralized point of the evidence. It was shown to the jury during Agent Fonzie's testimony, and it was shown on the screen that the two numbers did match. It was mentioned once in opening statement and it was mentioned in closing statement. But I'd like to share with the court the evidence that we focused on that was also emphasized in closing statement. Ms. Quintana was engaged in a text message threat with a man named Tyrone. And there was evidence at trial to suggest that during the March 9th robbery, there was a third person in the vehicle beyond Ms. Quintana and the bank robber. And there is good reason to believe that it was this man named Tyrone. And so he sent her a text message a few days later that said, hey, that guy you drive around robs banks, robs present tense. And she said, I know he robs them. He told me. And so that certainly went to her knowledge. Ms. Quintana made statements to the FBI that she did not drive Mr. Verdream on March the 9th and that she did not drive him in the week leading up to the robbery. And we showed surveillance video from multiple banks showing her vehicle driving Mr. Verdream, essentially deciding which of these banks he was going to rob. Are any of those videos in the appellate record? I don't know if they are, Your Honor, but if they're not, we'd be happy to supplement it. But in some of the surveillance videos, her car had very distinctive features. And so you could certainly see that that was her car. And Mr. Verdream identified that that was her car and that was him in the car. But she also had very bright orange hair. And in some of the surveillance videos, you could see her very bright orange hair as she was driving him around to these banks. The bank robber himself, Mr. Verdream, testified. And he testified that she drove him to as many as 16 banks in one day. He testified that he told her he was looking for a bank to rob. He testified that she didn't really react when he told her that he robs banks and that he had been convicted of robbing banks in the past. And he testified that he gave her portions of his bank robbery proceeds. And that, I think, was exhibited through her text message. There were also text messages introduced into the record at trial between the bank robber and Ms. Quintana, showing that the two were discussing money, and I think it was clear that she did need money. The other kind of very compelling piece at trial was during her interview with the FBI, the jury could hear the audio recording of that interview, but we had the two FBI agents who were interviewing her, who testified that she tried to delete the text message with this person named Tyrone in their presence during the FBI interview. And then the other piece of evidence I would point out to the court is after Mr. Verdream robs the Rio Grande Credit Union on March the 13th, we showed video surveillance of him running out of the bank into her car, and the car door is not even closed as she begins to just speed out of this parking lot. And so I think with all of that evidence at trial, truly it was overwhelming, both direct and circumstantial, to show a jury beyond a reasonable doubt that she did aid and abet the March 13th robbery. So assuming they had never seen that serial number, I believe they still would have found her to be guilty. So just to be clear, I do think that the court's analysis can end as to the foundation issue. We believe it was properly admitted. But if for some reason the court finds that the district court abused its discretion in doing so, it should still deny Ms. Quintana's request for a new trial. Counsel, do we have to reach the Rule 104B issue that you discussed in your brief? I'm sorry, Your Honor, I'm not recollecting what we wrote about that. That authentication is dependent upon fulfillment of a condition of fact. I wasn't clear on what you were arguing there, but maybe we don't need to reach it. I would say we don't, Your Honor. And absent further questions, that's what I have for the court this morning. Thank you. Thank you. Thank you for this opportunity to address the question of harmless error. I think Judge Murphy is correct when he says, when he points out that a match between the serial number on the particular bill recovered from Rhonda Quintana's phone with the list that was admitted into evidence, that is huge. That is not a minor piece of evidence. Ms. Roybal recounted some of the other evidence, and I think she did that fairly. But that's pretty much all circumstantial evidence. Rhonda Quintana drove Mr. Verdrine to a number of banks. Mr. Verdrine came running out of one of them and got in her car quickly and she drove off. Why is that circumstantial if the jury was shown the video? Isn't that direct evidence of participating with him? It's direct evidence that Mr. Verdrine came running out of the bank and got in her car. It's direct evidence of that. It's only by inference that it is arguably evidence of her knowledge of what he's doing. That's what this is about. Even though it's combined with other videos between March 9 and 13 of her driving him all around. It's not like he jumped into an unknown car. I'm not saying this is insubstantial circumstantial evidence. It's definitely evidence. But the strongest piece that links her to the actual robbery itself is the match between the bill and the list. And absent that, yes, there was evidence by which a jury might have been able to convict her. But certainly, I don't think we can say with any kind of assurance that the match between the bill and the list did not contribute in some substantial way to the jury's conviction. And that's really all I have to say about that. Thank you very much. Thank you, counsel. The case is submitted. Counsel are excused and the court will stand in recess until further call. Thank you.